NO. 16-40181

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

------------

NO. 3:13cv-00126

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

------------

GULF COAST ROD, REEL AND GUN CLUB, INCORPORATED;
GILCHRIST COMMUNITY ASSOCIATION,

**Plaintiffs - Appellants**

v.

UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL
CHRISTOPHER W. SALLESE, in his official capacity as District Engineer,
Galveston District United States Army Corps of Engineers; LIEUTENANT
GENERAL THOMAS P. BOSTICK, in his official capacity as Commander and
Chief of Engineers, United States Army Corps of Engineers; JOHN M.
MCHUGH, in his official capacity as Secretary of the Army,

**Defendants – Appellees**

------------

**BRIEF OF PLAINTIFFS-APPELLANTS**

------------

Winston Earle Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
Counsel of Record for Plaintiffs-Appellants

# CERTIFICATE OF INTERESTED PERSONS

Cause No. 16-40181

The undersigned counsel certifies that the following listed persons and entities as described in Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Appellants**:

Gulf Coast Rod, Reel, and Gun Club, Incorporated

Gilchrist Community Association

**Attorneys for Appellants:**

James B. Blackburn, Jr.

David Alfred Kahne

Winston Earle Cochran, Jr.

**Appellees:**

United States Army Corps of Engineers

Col Christopher Sallese

Lt. General Thomas P. Bostick

John M. McHugh

i

**Other Interested Parties:**

General Land Office of Texas

Former Commissioner Jerry Patterson

Commissioner George P. Bush

County of Galveston*

* The County of Galveston was not directly involved in this litigation but is involved in separate litigation to acquire the property in which Rollover Pass is located through eminent domain proceedings.

/s/ Winston E. Cochran, Jr.
Winston E. Cochran, Jr.
Counsel for Plaintiffs-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiffs-Appellants request oral argument because of the major economic impact of the likely result of this Court's decision on the permit at issue.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons                                       i

Statement Regarding Oral Argument                                      ii

Table of Authorities                                                    v

Jurisdictional Statement                                               1

Statement of Issues Presented                                          1

Statement of the Case                                                  2

    A.    Procedural History                                     2

    B.    Facts Relevant to the Issues Submitted                 3

        (1)  The Cast                                        3

        (2)  The Controversial History                       5

Summary of the Argument                                               10

Argument and Authorities                                              12

    Point of Error One                                                12

The district court erred in holding that cumulative effects were adequately considered with respect to the impact of salinity level changes in East Galveston Bay.

    A.    Standard of Review                                     12

        (1)  Review of a Summary Judgment                    12

(2)   Guidelines for Review of Agency Action                          14

B.     Guidelines for an Agency Decision                              18

C.     The Salinity Impact                                            21

(1)  The Variable Salinity of East Galveston Bay                     22

(2)  Inadequate Agency Consideration                                 24

D.     Harm and Remedy                                               27

Point of Error Two                                                   30

A.     Standard of Review                                            30

B.     The Need to Consider Alternatives                             30

C.     Harm and Remedy                                               35

Conclusion                                                           35

Certificate of Compliance                                            35

Certificate of Service                                               36

# TABLE OF AUTHORITIES

**Cases**                                                   **Page**

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548,
    91 L.Ed.2d 265 (1986)                      7, 13-14, 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,
    91 S.Ct. 814, 28 L.Ed.2d 136 (1971)              17

*City of Shoreacres v. Waterworth*, 332 F.Supp. 2d 992 (S.D. Tex. 2004),
    *aff'd*, 420 F.3d 440 (5th Cir. 2005)              16

*Churchill County v. Norton*, 276 F.3d 1060 (9th Cir. 2001)     18-19

*Gordon v. State of Texas*, 153 F.3d 190 (5th Cir. 1998)      3, 8, 18

*Ka Makani O Kohala Ohana Inc. v. Water Supply*,
    295 F.3d 855  (9th Cir. 2002)               12-13

*Klamath-Siskiyou Wildlands Ctr. v. Bur. of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004)               18

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)      15

*Luminant Generation Co., LLC v. United States Environmental
    Protection Agency*, 675 F.3d 917 (5th Cir. 2012)       15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,
    103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)          15

*Nat'l Fed'n v. Army Corps of Eng'rs*, 384 F.3d 1163 (9th Cir. 2004)   14

*Northwest Environmental Advocates v. National Marine
    Fisheries Service,* 460 F.3d 1126 (9th Cir. 2006)    12-15, 16,20

*Oceana v. Bureau of Ocean Energy Management*,
　　37 F.Supp.3d 147 (D.C. 2014)　　　　　　　　　　　　　19

*Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995)　　　　13

*Texas Committee on Natural Resources v. Van Winkle*,
　　197 F.Supp.2d 586 (N.D. Tex. 2002)　　　　　　　　17, 20

*Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998)　　15

*The Sierra Club v. Dombeck*, 161 F.Supp.2d 1052 (D. Ariz. 2001)　　17

*Westchester Fire Insurance Company v. Gulf Coast Rod, Reel
　　& Gun Club*, 64 S.W.3d 609 (Tex. App. – Houston [1[st] Dist.] 2001)　　8

## Constitutional Provisions, Statutes, Rules, Pattern Instructions

5 U.S.C. §706(2)(A)　　　　　　　　　　　　　　　14-15

　33 U.S.C. §1311　　　　　　　　　　　　　　　　　4

33 U.S.C. §1344　　　　　　　　　　　　　　　　　4

40 C.F.R. §1508.7　　　　　　　　　　　　　　　　21

FED. R. CIV. PROC. 56　　　　　　　　　10-11, 13-14, 28

U.S. CONST. Amend. VII　　　　　　　　　　　　　28

U.S. CONST. Amend. XI　　　　　　　　　　　　　3

**TO THE UNITED STATES COURT OF APPEALS:**

Come now the Plaintiffs-Appellants, the Gulf Coast Rod, Reel and Gun Club, Incorporated (hereinafter the "Club") and the Gilchrist Community Association (hereinafter the "Association"), through the undersigned counsel, and respectfully request that this Court vacate the judgment of the district court and remand this cause for further proceedings on a revised permit, if any.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the Southern District of Texas (Rec. Exc. Tab 5: Final Judgment, ROA.16-40181.1094). The Plaintiffs-Appellants gave timely notice of appeal (Rec. Exc. Tab 2: Notice of Appeal, ROA.16-40181.1104).

## STATEMENT OF ISSUES PRESENTED

This appeal presents two issues:

1.     The district court erred in holding that cumulative effects were adequately considered with respect to the impact of salinity level changes in East Galveston Bay.

2.     The district court erred in holding that the Corps adequately considered alternatives to closure of Rollover Pass.

## STATEMENT OF THE CASE

### A. Procedural History

This suit arises from a decision by the United States Army Corps of Engineers (hereinafter the "Corps") to issue a permit which would authorize the General Land Office of Texas (hereinafter the "GLO") to close a waterway in Gilchrist, Texas known as Rollover Pass.  The permit request was grounded in a study made for the GLO by an engineering firm, Taylor Engineering, and in various allegations of harm caused by Rollover Pass over the years since it was opened.[1]  Strictly speaking, the permit sought was for a discharge of approximately 140,000 cubic yards of sand and a subsequent demolition of left-over steel and concrete walls, but that work and material was for the closure of the Pass. After a review which included an Environmental Assessment ("EA") rather than a more detailed Environmental Impact Statement ("EIS"), the request for a permit was granted.

The Plaintiffs-Appellants then brought suit in the United States District Court for the Southern District of Texas, Galveston Division. Eventually an amended complaint was filed, and it was the operative pleading at the time of the disposition of the case  (Rec. Exc. Tab 5: Excerpts from Plaintiffs' Amended Complaint,

---

[1]   Some of those earlier allegations were, to put the matter simply, attempts by private plaintiffs and their attorneys to make money from beach erosion. A target other than an immune government had to be found.

2

ROA.16-40181.265 *et seq*.). Originally Jerry Patterson, who was the Commissioner

of the General Land Office of Texas ("GLO") at the time the permit was sought and

issued, and the GLO itself also were named as defendants in the district court

litigation. The GLO and Commissioner Patterson were subsequently dropped from

the suit after they invoked the protection of U.S. CONST. Amend. XI.[2]

Both sides sought summary judgment. The district court judge granted

summary judgment for the Defendants-Appellees on December 4, 2015 (Rec. Exc.

Tab 3: Final Judgment, ROA.16-40181.1094; Rec. Exc. Tab 4: Memorandum and

Order, ROA.16-40181.1095 *et seq*.). The Plaintiffs-Appellants timely appealed.

## B.  Facts Relevant to the Issues Submitted

### (1)  The Cast

A good starting point is to introduce the formal parties for the present

proceeding. The Gulf Coast Rod, Reel, and Gun Club, Incorporated is a private

organization.  As noted by this Court's earlier visit to Rollover Pass in *Gordon v.*

*State of Texas*, 153 F.3d 190 (5th Cir. 1998), the Club acquired 22 acres of land at

---

[2] The GLO and Commissioner George P. Bush, who succeeded Commissioner Patterson in office, are, as a practical matter, the primary opponents of the Plaintiffs-Appellants.  It is the GLO which requested the permit for closure of Rollover Pass.  Due to applicable Texas law, the County of Galveston would be the governmental entity which would be exercising eminent domain over the property on which Rollover Pass is located, with an eventual transfer. The eminent domain proceedings commenced, with Galveston County showing no inclination to await a decision from this Court.

Gilchrist in the 1940's. Due to the very low elevation at this spot, high tides could cause the spot to flood and provide a flow between the Gulf and the bay, while at low tide the area was not under water. The location is known as "Rollover" because, as the Memorandum and Order observes, smugglers "would roll barrels of liquor and other imports over the strip of land to avoid customs officials in nearby Galveston" (ROA.16-40181-1068).

The Gilchrist Community Association is a nonprofit civic organization which seeks to improve life in Gilchrist and which assists with the upkeep of fishing facilities at Rollover Pass. Most of the active members reside in the Gilchrist community. The economic well-being of the community depends in part on the business transactions generated by people who visit Rollover Pass.

On the other side of the litigation, the Corps of Engineers has responsibility for issuance of the permits which are required when a person or entity seeks to discharge a pollutant, including fill material, into navigable waters in the United States. *See* 33 U.S.C. §§1311, 1344.

Colonel Sallese, General Bostick, and Secretary McHugh administer the operations of the Corps of Engineers, including the issuance or denial of the aforesaid permits.

In the background is the General Land Office of Texas ("GLO"), the animating

force behind the efforts to close Rollover Pass. When proceedings were initiated, the Commissioner of the GLO was Jerry Patterson. Hence early pleadings bear Commissioner Patterson's name. The current Commissioner of the GLO is George P. Bush.

### (2) The Controversial History

Despite the colorful, adventurous smuggling activities in the past, Bolivar Peninsula remained sparsely settled well into the Twentieth Century. A railroad which ran from Beaumont to Galveston, utilizing a ferry at the Bolivar Roads, eventually was abandoned. Oil was drilled but not refined at High Island, cattle grazed on much of the land, commercial fishermen, shrimpers, and oystermen made their periodic harvests in Galveston Bay or in the Gulf, and vacationers came for swimming and fishing. Bolivar Peninsula is the closest ocean recreation area for the hundreds of thousands of people who live in East Texas and many parts of the Midwest. Here we mean ordinary people, people who drive to their recreation spots in cars and trucks, not those who can afford to fly a family to South Padre Island, the Florida Keys, or Carribean resorts.

The story of the Pass itself began in 1954, when the wildlife management agency of the State of Texas, operating under an easement from the Club, obtained a permit to excavate a "fish pass" between the Gulf of Mexico and East Galveston

Bay at the narrow spot on the Bolivar Peninsula owned by the Club at Gilchrist.
Upon completion, Rollover Pass crossed the Club's land from the Gulf of Mexico to
East Galveston Bay.

The Pass was excavated with beneficial goals in mind. A "fish pass" is just
what the name implies: a corridor allowing fish to migrate more easily between
bodies of water. Bolivar Roads, the main outlet for Galveston Bay to the ocean, is
about twenty miles away. For reasons of reproduction, feeding, or avoidance of
adverse weather conditions, many fish migrate back and forth between the ocean and
estuaries. Rollover Pass made that much easier. For example, it is impossible to
know how many fish, over the decades, have escaped the consequences of a "cold
snap" affecting the bay by virtue of Rollover Pass (since survivors who make it to the
deep ocean cannot be tabulated), but no one who understands fish populations should
doubt that such an incremental benefit was obtained.

These species of fish and crustaceans require salt water to survive. Depending
on tides, flows from upstream, winds, and even hurricanes, the blend of salt water and
fresh water in an estuary system is in a constant state of flux. East Galveston Bay,
like the rest of the bay system, receives a large amount of fresh water during periods
of heavy rain and runoff. This can make the salinity inadequate for certain fishes and
crustaceans. Some of the fish could swim the twenty miles to Bolivar Roads for a

saltier blend, but many of these animals, including crabs and oysters, cannot.[3]

The Pass also was intended to be a site for sport fishing. As developed by the State, each side of the Pass had bulkheads, railings, and paved spots for fishermen to stand. In 2008 the railings were significantly damaged by Hurricane Ike. The land on each side of the Pass is used primarily for parking or camping by people who fish at the Pass. In comparison to surf fishing or pier fishing, the Pass has been a place where casting or dropping a baited hook into the water is a relatively easy matter. It arguably was a safer place for children to fish until Hurricane Ike damaged the facility. Rollover Pass was particularly known as a location for a "flounder run" in the fall because it was a migration pathway for flounders leaving the bay for the deeper Gulf water during the winter.

A popular fishing location also leads to related business activities, such as the sale of bait, tackle, and food. The local economy of Gilchrist became heavily dependent on the Pass. The proximity of the Pass also encouraged people who like

---

[3] The Corps has scoffed at the idea that salinity enhancement was part of the original goal as being hearsay read from a historical plaque (ROA.16-40181.990). If the Corps' in-house proceedings never even inquired into this question of historical fact about a key issue, such that the Corps' own attorneys would know the answer, then that in itself suggests the inadequacy of the permitting review. Be that as it may, evidence in response to a summary judgment request need not be in a form admissible at a jury trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Defendants-Appellees also contend that the original intent of the agency which constructed the Pass is "irrelevant" (ROA.16-40181.991), but it *is* relevant as to whether current modeling estimates are reliable, and it is relevant as to whether Taylor Engineering and the Corps adequately considered long-range effects.

to fish to construct or rent vacation homes in the vicinity.

Despite its benefits, Rollover Pass became the target of recurrent complaints over the years. One complaint is that Rollover Pass now makes East Galveston Bay *too* salty. This will be discussed in more detail in Point of Error One.

It also has been alleged, more than once in the history of the Pass, that sand which otherwise would be distributed along the beach west of the Pass was instead swept into the bay through the Pass. The lack of sand replenishment allegedly caused erosion of the beach west of the Pass. For example, in 1996 several landowners sued the Club, asserting beach erosion and damage to wildlife habitat. *Westchester Fire Insurance Company v. Gulf Coast Rod, Reel & Gun Club*, 64 S.W.3d 609 (Tex. App. – Houston [1ˢᵗ Dist.] 2001).[4] Those plaintiffs claimed that they "recently discovered" that the erosion was caused by the acts of the defendants. *Id*., at 610. The Club's insurance company, seeking to avoid coverage liability, asserted that the Club "had known about the erosion for at least 20 years." *Id*., at 612. The cases eventually were transferred to federal court, leading to this Court's decision in *Gordon, supra*. By the time that litigation reached this Court, however, the land-owning plaintiffs were claiming that the State of Texas had "made a variety of structural improvements" to

---

[4] Rollover Pass existed for four decades before that suit was brought. The ongoing existence of the Pass surely did less damage to "wildlife habitat" than the construction of beach houses by those plaintiffs and their neighbors.

the Pass, and "the recent severe erosion west of the Pass was attributable mainly to the 1995 structural improvements made to the Pass." *Id.*, at 192. The various critics could not even agree as to when the erosion began or was noticeable.

It further has been alleged at various times that the sand drawn into the bay was deposited into the Gulf Intracoastal Waterway, which passes through the open waters of East Galveston Bay behind Rollover Pass. These deposits, it has been said, increased the amount (and therefore the cost) of dredging required for maintenance of the Waterway.

In 2008 Hurricane Ike devastated property on the Bolivar Peninsula, particularly at Gilchrist. The infrastructure of the fishing facilities at the Pass suffered greatly. The GLO, which administers public lands of Texas, including beaches, was inclined to close the Pass, so the GLO commissioned a Florida engineering firm's study of the effects of closure and alternatives to closure. After the engineering firm, Taylor Engineering, tendered its study to the GLO, the GLO applied for a permit for actions which would effectively close Rollover Pass.[5] As the stated purpose for the permit application, the GLO contended:

---

[5] As a sop to local residents and to fishermen who come from far and wide to fish at Rollover Pass, Commissioner Patterson proposed building a fishing pier. The Corps would never approve a pier at what would be equivalent to ground level, just a few feet above normal sea level, so the fishing experience at the new pier would be very different from the current experience of fishing at the pass.

9

The applicant's stated purpose of the proposed project is to reduce coastal erosion by eliminating the sediment transport into Rollover Pass. By doing so, the applicant plans to return Rollover Bay and East Bay to their historical salinity regimes, and to reduce Corps maintenance costs associated with keeping the GIWW (the Gulf Intracoastal Waterway) navigable. According to the Gulf Intracoastal canal [sic] Association (GICA) and Corps studies; the Corps spends over $1 million dollars [sic] to keep the Rollover Pass segment of the GIWW open.

As the district court noted, the Corps then went through the required procedural steps, which included an opportunity for public commentary.[6]

After the permit was approved, the Plaintiffs-Appellants initiated this litigation. The Plaintiffs-Appellants sought to supplement the record from the permit proceedings with additional studies, and the district court admitted some of that information but not all of it.

## SUMMARY OF THE ARGUMENT

The Plaintiffs-Appellants present two points of error, mirroring two of the three main challenges to the permit process which were addressed in the district court's Memorandum and Order.

The Plaintiffs-Appellants first contend that the district court judge incorrectly

---

[6] Although a summary report published on the GLO web site recommended closure, a longer, more thorough version of the report pointed out that certain infrastructural changes also could address the problems. Only an abridged version, amounting to a summary, was linked to the GLO website. Nothing in the record indicates how many members of the public dug deeper than a cursory Internet search to see what the full report from Taylor Engineering said. An opportunity for public commentary without a full disclosure of information may have been of less value in that situation. At this point there is no way to tell.

accepted the Corps' evaluation of the cumulative effects of diverse forces on the salinity of East Galveston Bay. The first part of the discussion concerns the standard of review. The parties appear to disagree as to the applicability of FED. R. CIV. P. 56, with the Plaintiffs-Appellants maintaining that the traditional standard applies even though the question to be examined focuses on the adequacy of the Corps' review prior to issuance of a permit. Of particular importance for such review is the need to consider cumulative effects. The Corps accepted the modeling work of Taylor Engineering without adequate consideration of competing, and better, scientific inputs which were available. The Corps also notably failed to take into account a looming threat of increased freshwater inflow from a new canal designed to divert large amounts of flood water from the Beaumont area. Under the circumstances, disposition by summary judgment was not appropriate.

The second point of error argues that the district court erred in holding that the Corps adequately considered alternatives to closure of Rollover Pass, as required by the National Environmental Policy Act ("NEPA"). Review of this issue incorporated abbreviated analyses of the other controversial issues, such as erosion and dredging costs attributable to the Pass. These issues also were not suitably resolved by summary judgment, given that alternatives are available and should have been given more thought by the Corps.

For both points of error, the appropriate remedy is a remand to the district court for further proceedings, probably including a trial, but that could be affected by reconsideration of the issues within the Corps' own review system.

## ARGUMENT AND AUTHORITIES

### POINT OF ERROR ONE

**The district court erred in holding that cumulative effects were adequately considered with respect to the impact of salinity level changes in East Galveston Bay.**

### A.  Standard of Review

In many appellate cases the standard of review is treated as a noncontroversial foundation for discussion.  In this cause, however, the standard is a complex issue, and not without controversy.  It has two prongs – one consisting of summary-judgment principles, and one consisting of some principles relating to agency actions and the degree of deference those actions may be due.

### (1) Review of a Summary Judgment

The first step is to determine how to review the district court's decision, bearing in mind that it is the district court's decision (not an agency ruling and certainly not the broader question of closing Rollover Pass) which this Court is to review on appeal.  The grant or denial of a summary judgment by a district court in a suit involving a challenge to agency action is reviewed *de novo*. *Northwest*

*Environmental Advocates v. National Marine Fisheries Service,* 460 F.3d 1126 (9th

Cir. 2006). The Ninth Circuit explained in that case:

> De novo review of the district court judgment means that we must "view
> the cases from the same position as the district court." *Ka Makani O
> Kohala Ohana Inc. v. Water Supply*, 295 F.3d 855, 959 (9th Cir.
> 2002)(quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1507 (9th Cir.
> 1995).

As to the substantive standard, that is correct. But this Court also should decide *de

novo* whether disposition by summary judgment, as opposed to disposition by a trial

on the merits, was correct.[7]

The normal standard for review of summary judgments sought under FED. R.

CIV. P. 56 provides that "summary judgment is proper when the record, viewed in the

light most favorable to the non-moving party, establishes that no genuine issue as to

any material fact exists, and the moving party is entitled to judgment as a matter of

law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986). Under *de novo* review, this Court is free to reject the district court judge's

approach to the question of whether to grant the extreme remedy of summary

---

[7] It is true that both sides agreed that the method of dueling motions for summary
judgment could be used. That agreement does not waive the governing standards for summary
judgments, however. An agreement to resort to summary judgment motions presupposes that, if
the motion for summary judgment on behalf of the Defendants-Appellees did not meet the test
stated in Celotex, then a trial on the merits would be the next step. Obviously the Plaintiffs-
Appellants would expect the same if, as the district court found, their request for summary
judgment was unsuccessful. In short, there was never an agreement to change the Federal Rules
of Civil Procedure or to ignore relevant Supreme Court case law.

judgment.

The Defendants-Appellees argued in the district court that Rule 56 "is not employed" in this type of case (ROA.16-40181.965). That is incorrect. Its focus is different from its focus in a typical case, in that a prior agency decision, rather than a set of facts asserted by parties in court, is under consideration, but that does not make the rule inapplicable. Nothing in Rule 56 says the rule is inapplicable to review of agency decisions. On the contrary, the very first Note appended to the Rule states: "This rule is applicable to all actions, including those against the United States or an officer or agency thereof." The fact that this is a case reviewing an agency decision does not change basic summary-judgment principles. A federal agency, such as the Corps, should not be exempted from satisfying the *Celotex* standard before its action is upheld via summary judgment.

### (2) Guidelines for Review of Agency Action

The district court's Memorandum and Order agreed with *Northwest Environmental*, and numerous other cases, as to the limited scope of review of the agency decision. *Northwest Environmental* stated:

> Pursuant to the Administrative Procedure Act, a court may set aside the decision of an administrative agency such as the Corps only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A)*; see Nat'l Fed'n v. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004).

14

In an analogous but not identical context, this Court fleshed out that concept:

> Under the APA, we must hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998)(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

*Luminant Generation Co., LLC v. United States Environmental Protection Agency*, 675 F.3d 917, 925 (5th Cir. 2012). The Ninth Circuit presented an almost identical explanation in *Northwest Environmental*, except it also classified an "agency's decision [which] is contrary to the governing law" as another form of "arbitrary and capricious" agency action. *Id.,* citing *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

The *Luminant* court did not hold that an "abuse of discretion" is as narrow as "arbitrary and capricious" action. Digging into the merits of the issues, the Plaintiffs-Appellants submit that there are two equally valid concerns: Did the Corps act "arbitrarily and capriciously" by failing to consider an important aspect of the problem? Did the Corps abuse its discretion by not adhering to the principles which

15

should guide one of its permitting decisions?

As the Memorandum and Order in this cause noted, citing *City of Shoreacres v. Waterworth*, 332 F.Supp. 2d 992, 1004 (S.D. Tex. 2004), *aff'd*, 420 F.3d 440 (5th Cir. 2005), "the administrative record provides the complete factual predicate for the court's review." Actually, as this cause illustrates, there is some room for additional materials, but matters outside the agency hearing record are best viewed as helping to show why agency review did not consider cumulative effects.

The Plaintiffs-Appellants disagree with the *Shoreacres* court's next statement, even though it was accepted by the district court judge in this cause: "The Court's task is to consider the administrative record as a whole, *without reweighing evidence*, and determine whether the Corps acted arbitrarily, capriciously, or in violation of legally required procedure in its decision to issue a permit to close Rollover Pass." (ROA.16-40181.1077)(emphasis added). The problem with that statement is that complete deference to the agency as to the weight of evidence is in conflict with the summary-judgment standard. In a summary-judgment case, the governing presumption should be that a judge or jury, hearing the merits, *could* assign weight to some evidence which, according to the summary-judgment movant, is of no worth.

The standard of review takes on nuances because of the Administrative Procedure Act. As the Memorandum and Order states, Section 706 of the Act

16

"requires the Plaintiffs to show that the Corps' actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'without observance of procedure required by law.'" (ROA.16-40181.1075).  The Plaintiffs-Appellants, well aware of that standard, have predicated their suit on the view that the permitting decision was not in accordance with legal principles that apply to such decisions. Those principles are set forth in Part B below. Whether there was compliance is inherently a factual question, and in this instance key facts remain in dispute.

One pitfall for the Plaintiffs-Appellants, in terms of the standard, is the view expressed in *Texas Committee on Natural Resources v. Van Winkle*, 197 F.Supp.2d 586, 595 (N.D. Tex. 2002), citing *The Sierra Club v. Dombeck*, 161 F.Supp.2d 1052 (D. Ariz. 2001), that "in reviewing administrative agency decisions, the function of the district court is to determine whether [,] as a matter of law, evidence in the administrative record permitted the agency to make the decision it did."  That phrasing amounts to saying that an agency decision must be upheld if *any* possible reading of the administrative record supports it. The Administrative Procedure Act need not be read as going that far.  On the contrary, such an approach seems inconsistent with the need to consider cumulative effects.

The Memorandum and Order in this cause, invoking a "clear error" standard traced back to *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91

17

S.Ct. 814, 28 L.Ed.2d 136 (1971), stated that a plaintiff must demonstrate an agency's "abuse of discretion." Assuming *arguendo* that this is a correct standard for this cause, that merely means there were instances in which legal principles which were required to be part of the agency review but were not applied. As explained below, that problem occurred with respect to the salinity issue.

## B. Guidelines for an Agency Decision

Agency decision-making is rarely an easy task. There are different points of view, different objectives, and different quasi-scientific hypotheses about the future, on almost any topic which would require agency action. This Court's decision in *Gordon* recognized that some of the questions surrounding Rollover Pass are inherently "political," *i.e.* driven by policy considerations, more than they are "legal." That probably is true in a large number of the permitting decisions which the Corps has to make. That said, there still are certain principles with respect to *how* agency review proceeds, and an agency's adherence to these principles is fair game for examination in court.

The first key principle is that a court should "review agency decisions to ensure that 'the agency has taken a 'hard look' at the potential environmental consequences of the proposed action.' *Klamath-Siskiyou Wildlands Ctr. v. Bur. of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004), quoting *Churchill County v. Norton*, 276 F.3d 1060,

1072 (9ᵗʰ Cir. 2001). Such a figure of speech is not the most precise guidance, but it does contemplate that an agency, and in turn a court, will not simply accept an assertion of fact on its face. That includes purportedly scientific assertions, for it is the realm of so-called "science" that cross-examination (the truth-detecting tool missing from agency review) is often the most useful. The burden of persuasion needs to be placed on a permit applicant.

A second principle is to defer where deference makes sense, but not where it makes no sense. *Northwest Environmental* commented that a court should "carefully scrutinize an agency's actions under NEPA" while also being "mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency." The question then becomes *what* scientific matters actually are within the expertise of the agency in question. For example, the Corps has long had expertise in controlling the flow of navigable waters through structural improvements. Yet, despite the Corps' assertion that the Corps is "the congressionally delegated expert agency" on salinity and its impacts (ROA.16-40181.991), it was neither claimed nor proved that anyone within the Corps who worked on the Rollover Pass permit project actually was an expert on how changes in salinity affect fish or oysters.[8] In this case,

---

[8] The Corps has argued that agencies "are entitled to an 'extreme degree of deference' when they are evaluating scientific data within [their] technical expertise," citing *Oceana v. Bureau of Ocean Energy Management*, 37 F.Supp.3d 147, 154 (D.C. 2014). Even *Oceana,*

as in others, an agency often *must* rely on outside information, sometimes in the form of commissioned studies sponsored by applicants. The qualifications, resources, and biases of outside "experts" need to be scrutinized. Similarly, competing points of view as to what is the scientific truth need to be considered.

Third, when reliance must be made on outside sources for scientific inputs to the decision-making process, there is always a question of what to consider and what not to consider. Some evidence which deserves to at least be considered will often not get considered. It is not possible to know what an agency actually considered before a decision is announced and the reasoning is explained. Therefore it often will be the case that a litigant in court can identify additional materials which ought to be considered. As the Ninth Circuit noted: "We review a district court's decision to exclude extra-record evidence for abuse of discretion." *Northwest Environmental, supra* at 1133.

Finally, and probably most important of all, is the proposition that when environmental impacts are considered, the "cumulative impact" must be evaluated. *Northwest Environmental, supra*. This is required under the National Environmental Policy Act (NEPA). *Texas Committee, supra* at 618. The term "cumulative impact"

---

decided in an agency-friendly District of Columbia court, limited its deference to those matters within the agency's own area of expertise.

is defined in 40 C.F.R. §1508.7 to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

Within the realm of "cumulative" impact, it is appropriate to consider other hypothetical situations, such as resort to alternative remedies, in order to better understand the possibilities of how different influences can work together or in conflict. In this instance, for example, some alternative remedies might change existing effects to the degree that the perceived evils of Rollover Pass would be overcome, even if the Pass is left open.

### C. The Salinity Impact

The Plaintiffs-Appellants included an allegation in their suit that the Corps "failed to consider cumulative impacts" with respect to salinity levels (Rec. Exc. Tab 5: Plaintiffs' Original Complaint; Rec. Exc. Tab 4: Memorandum and Order; ROA.16-40181.1077). The salinity issue was the focus of the first of the three big issues discussed in the Memorandum and Order.

The Corps' assurances that its examination of Taylor Engineering's work was thorough enough to take into account cumulative impacts are cold comfort. Here was an example of modeling, not actual real-world evidence, being the basis for decision, as the district court noted. (ROA.16-40181.1071, 1077-1079).

Begin with two simple questions: What is really the change that was to be proved in the permitting process? Who had the burden? The Taylor Engineering modeling was designed as if the goal was to negate the idea that closure would, as a general matter, leave the salinity too low in East Galveston Bay. That, however, stands the permit seeker's original assertion on its head. The GLO originally claimed that it wanted to "return Rollover Bay and East Bay to their historical salinity regimes."[9] For that purpose, the proper scientific question should have been whether actual historical data proved that, *ceterus paribus*, Rollover Pass consistently made areas *too* salty, and further proved that this increase actually mattered to fish or oysters.

### (1) The Variable Salinity of East Galveston Bay

The facts are far from clear that too much salt water, entering through Rollover

---

[9] Carried to its logical conclusion, and depending on what length of time constitutes "history," that rationale calls for filling in the Intracoastal as well, for it also connects with the bay. The same applies to the Houston Ship Channel, which is many feet deeper (and therefore brings in more salt water on a rising tide) than occurred in the old days of shallow-draft sailing ships.

Pass, is a greater evil than the evil which the Pass would counteract. The Plaintiffs-Appellants have stressed that there are good reasons to have access to an input of higher-salinity water. In the Amended Complaint, the Plaintiffs-Appellants pointed out that the GLO's own consultant said a "target" salinity for East Bay "ranges from a low of 17 parts per thousand ("ppt") to a high of 24 ppt" (ROA.16-40181.281). That range *already is achieved while the Pass is open. Id*. Measurements from the pre-Pass era indicated lower, less desirable, salinity. That deficient salinity was one of the reasons why the Pass was opened in the first place – and in a full trial, the Plaintiffs-Appellants would show that with more evidence than just a recollection of a now-gone historical plaque.

Over half a century, the inputs of fresh water for East Galveston Bay have varied continually, due to many factors. Some were long-term – the damming of the Trinity River, the growth and decline of rice-farming canals, urban growth causing more run-off, *etc*. But turbulent Texas weather has provided many, many instances of discrete flooding events, leading to a temporarily higher level of fresh water (and, in general, a lower measured salinity for some period of time) in Galveston Bay. Even those events are modified by rising or falling tides, the strength of a wind blowing water pushing water into or out of shallow bay areas, *etc*. The point is that there are times when additional salt water *is* needed for optimal salinity.

23

### (2) Inadequate Agency Consideration

There is at least some evidence which, if believed, would indicate that the Corps was overlooking factors contributing to the salinity quandary, contrary to the requirement of considering the cumulative effect of diverse inputs. The Plaintiffs-Appellants pointed out that the Corps resorted to an Environmental Assessment ("EA") rather than a more detailed Environmental Impact Statement ("EIS") in its review process (ROA.16-40181.284). The Corps' finding of no significant impact from closure of the Pass therefore was not based on the best evidentiary foundation.

Two examples of this shortcoming should suffice, at least to show that summary judgment was improper. First, the Corps failed to consider the premier salinity database, a computer model called TxBLEND. The amended complaint sets forth the reasons why TxBLEND is not only reliable, but is in fact relied upon by Texas state agencies. Instead of following the TxBLEND system, however, the GLO's consultant monkeyed with the data inputs traditionally used in applying TxBLEND (ROA.16-40181.290). Most significantly, substantial freshwater inflows to East Galveston Bay via a tributary called Oyster Bayou and via the Intracoastal Waterway were not counted. If known inputs of fresh water were ignored or minimized, it is no surprise that the need for saltwater inputs was not understood and appreciated fully. The Defendants-Appellees argued in the district court that Oyster

24

Bayou was ignored by Taylor Engineering (and hence by the Corps) because "freshwater inflow data for Oyster Bayou were unavailable" (ROA.16-40181.974). Imagine if NASA operated that way and decided "We don't know what the weather is, but go ahead and launch." More importantly for present purposes, a confession of ignorance as to key data virtually concedes that the evidence was not one-sided in the Defendants-Appellees favor, such as would support a summary judgment.

The Plaintiffs-Appellants also pointed out to the district court that, as to East Galveston Bay in particular, an important concern is the Needmore diversion canal, a proposed waterway designed to relieve flooding in the Beaumont area by directing water away from the Neches and Sabine watersheds and into East Galveston Bay.[10] The river water may be muddy, but it has very low salinity, compared to what the salinity should be in the This is a long-term contributing factor which should not be ignored. In fact, a potential "bear trap" of notably diminished salinity could occur if Trinity River inflow (which the Defendants-Appellees say is 60% to 70% of the bay system's freshwater inflow, ROA.16-40181.974) and Needmore flow encroached upon East Galveston Bay from opposite sides, as could happen if there were massive storms upland throughout East Texas. In that situation, the only source of saltier

---

[10] Just this year, the flooding around Beaumont was so severe that it closed Interstate 10, so this is not a trivial amount of flood water which could be channeled into East Galveston Bay.

25

water to offset a great increase in fresh water might be Rollover Pass.[11]  It is not

necessary to contemplate "nightmare" scenarios, however, in order to recognize that

the Needmore project looms as a huge factor.  Needmore means East Galveston Bay

will need more salt water.

In seeking summary judgment, the Defendants-Appellees shrugged off the

likely flows from the Needmore diversion canal, stating that "Needmore does not

change the amount of freshwater inflows into the Gulf Intracoastal Waterway" but

does change "the rate of inflow over a brief period of time after a major storm to

avoid flooding (ROA.16-40181.974).  How does Taylor Engineering or the Corps

know how much total water will be diverted, adding to the inflow, at any point in the

future?  That depends on how long and how hard the rain falls upstream of Beaumont.

The real experts, *i.e.*, professional weather forecasters would not attempt to predict

a particular day's or week's rainfall years in advance.  Furthermore, what would

experts, *i.e.* biologists, say about how long salt water fish could survive if they found

themselves in water with very low salinity for the duration of flood runoff?  The

Defendants-Appellees' mere assumption that it would not be a problem does not

---

[11]  Water in the Intracoastal Waterway also mixes with the water in East Galveston Bay, but the net effect of intersections with the Intracoastal is not necessarily an added source of sea water.  Depending on weather conditions and tides, the Intracoastal itself could be a vector for fresh water, not salt water.

mean that it would not, in fact, be a problem. Why give one-sided speculation the benefit of summary judgment?

Finally, the cumulative-effect analysis should not be static. As stated earlier, other alternative remedies should be considered along with the known combination of inputs, for remedial steps can modify or even eliminate other inputs to the calculus. That shortcoming in the district court's analysis is the subject of the next point of error, but it is important to recognize that the salinity issue is one in which consideration of alternatives really would matter in reaching an optimal solution to whatever salinity problem exists – not that the GLO ever really proved that there was any such problem at all.

## D. Harm and Remedy

Even though the Corps also considered erosion and dredging issues, that would not necessarily mean that any error in the district court's salinity review was harmless. Even if, for example, the Corps claimed that the dredging costs favored closure, that does not establish, as a matter of law, that the permit would have been issued without any reliance on the salinity issue.

This Court is not being asked to decide anything at this moment other than to find that disposition of the salinity issue by summary judgment was contrary to

applicable principles, and hence was error by the district court. The remedy is a remand to the district court. As pointed out in footnote 7, the agreement struck in the district court did not waive the applicability of Rule 56, *Celotex*, and other governing case law.

What should be done in the district court? It must never be forgotten that the Plaintiffs-Appellants had a right, under U.S. CONST. Amend. VII, to a trial by jury.[12] That is not undermined by the absence of a jury request at the present, since a jury request would have been pointless while summary judgment was under consideration. As is common in litigation, summary judgments were sought by both parties. If the state of the record had so strongly favored one side or the other that trial by jury would make no difference, then the conservation of judicial resources by avoiding a full trial would have been worthwhile, and neither party should be faulted for making the effort. At the end of the day, however, the Defendants-Appellees' inability to justify a summary judgment means a trial should proceed.

On remand, it is most likely that a jury trial would occur, although plenty of cases settle before trial. In this cause, for example, the Plaintiffs-Appellants already have demonstrated their willingness to agree to a fair compromise by abandoning the issue of fishing facilities for disabled people after some special accommodations on

---

[12] So do the individual defendants-appellees.

a new pier were promised.

If jury trial cannot be avoided, then the trial would bring to bear all of the advantages of trial. In a court trial, the parties' attorneys are able to use the traditional tools of legal advocates, including various forms of discovery. Even more important, whether the context is discovery or a trial itself, is the power of cross-examination.

Most important of all, however, is the common sense and collective wisdom which the jury itself brings to the process.

There is another path to consider as well. Notwithstanding the "record rule," the district court has inherent power to order further Corps hearings. That is not avoidance of the record, but rather a step to improve the record, as well as improving the permit review process itself. The Corps also has the authority to act on its own, including the gathering of more evidence and the consideration of additional alternative proposals. While there may be some delay, that delay would be puny in comparison to the length of time in which the effects of an incorrect permitting decision to close Rollover Pass would be felt. Make no mistake about it: once the Pass is closed, it will not be re-opened.

## POINT OF ERROR TWO

**The district court erred in holding that the Corps adequately considered alternatives to closure of Rollover Pass.**

### A. Standard of Review

The standard of review is the same as for Point of Error One, so the discussion therein is incorporated here by reference.

### B. The Need to Consider Alternatives

As the district court's Memorandum and Order recognized, "NEPA requires agencies to consider practicable alternatives to a proposed action. 42 U.S.C. §4332(2)(C)(iii) (requiring under NEPA that for "every recommendation or report on proposals' affecting the human environment, there be a 'detained statement' on 'alternatives to the proposed action." (ROA.16-40181.1085). Necessarily, such a discussion of alternatives requires adequate consideration before conclusions are reached.

This requirement is, as the district court judge said, "driven" by the purpose of the project. In this instance the GLO's stated purpose included several goals: (1) restoration of the area to "historic natural conditions," (2) preventing shoreline erosion, (3) preventing sedimentation of the Intracoastal Waterway, (4) reducing

salinity in th bay, and (5) cutting down dredging costs for the Intracoastal Waterway. (ROA.16-40181.1086). The goals should not be viewed so narrowly as to make only the action proposed by the permit seeker an adequate solution.

The district court judge then undertook 'lightning round" analyses of the various goals, even though each of them could be a major topic of debate. For example, concerning beach erosion, the district court stated:

> Although Plaintiffs disagree with the amount of erosion attributable to Rollover Pass, the Corps cites numerous studies from over a fifty-year period that have found some degree of erosion attributable to Rollover Pass. AR COE000495-503. Even if Plaintiffs are correct that there are similar erosion levels along other portions of the peninsula, the Corps' analysis indicated that closing the Pass would decrease erosion downdrift from the Pass.

(ROA.40181.1087). That does not answer the question, however, of whether there exist alternatives to closure which would solve the alleged erosion problem.

Unmentioned in the district court's opinion is the possibility that physical structures could stop the erosion, at least reducing it to the average erosion rate for Texas beaches. Inadequate consideration of this approach ranks as a major shortcoming. Numerous examples of the use of erosion-control structures exist. Twenty miles down the Bolivar Peninsula, the North Jetty and the South Jetty guard the Houston Ship Channel from being clogged with too much sand being drawn into

the channel. Jetties guard the ship channels at Freeport, Port O'Connor, and South Padre Island as well. Along the beachfront of Galveston, numerous rock "groins" fight erosion. The Corps was involved with most, if not all, of these projects.

Rollover Pass, in contrast, has never been given the benefit of such structures. In fact, Taylor Engineering's full report had pointed out that various configurations of structures might redirect the long-shore current and redirect sand now drawn into Rollover Pass farther down the coastline. Erosion is the net effect of the loss of westward-moving sand not being replenished by sand arriving from the east. Structures tipping the balance in favor of replenishment may be more effective than closure. As an added benefit, a rock groin could provide a foundation for the pier promised by the GLO. Without a doubt, the pier fishing would be enhanced by having Rollover Pass close at hand.

Ironically, the Memorandum and Order then noted one comment which took a stance *against* fishing at the Pass:

> Additionally, during the public comment period, the National Marine Fisheries Service stated "closure of Rollover Pass would have positive impacts on [Essential Fish Habitats] and ecosystems benefits[,], which include restoring natural hydrology, improving salinity conditions for oyster reef re-establishment and health[,], and reducing the very concentrated fishing pressure on adult finfish populations, such as flounder[,], as these fish migrate through an artificial cut." AR COE1681.

(ROA.16-40181.1088). Perhaps whatever "expert" thought up this slaughterhouse theory should consider that, with the Pass closed, these migrating fish would simply have to run the gauntlet of fishermen at the Galveston jetties at migration time, after a twenty-mile journey. But here again the failure to consider alternative solutions appears, for a less drastic remedy is very easy: limits on flounder catches. Perhaps the federal agency did not know that Texas now has such limits.

From the same comments, the district court judge extracted the generalization about "improving salinity conditions for oyster reef re-establishment and health." Someone at the Fisheries Service presumably is a biologist, but perhaps not a very good one. A good biologist would know that water which is not salty enough is also a threat to oysters.

The underlying question is the adequacy of consideration of alternatives. Deciding what alternative, or combination of alternatives, would work better is inherently speculative. Granted, some deference must be given to the Corps' speculation as opposed to someone else's, but when the adequacy of other alternatives is readily shown, that raises huge doubt about the thoroughness of the Corps' consideration of alternatives. A jury, applying common sense, might easily conclude that the Corps simply missed the superiority of an alternative solution to the salinity problem.

The Plaintiffs-Appellants will close with an illustration of that. There is one very simple remedy for cutting down the salinity-increasing effect of Rollover Pass. Since the inflow of salty water is primarily on an incoming tide, a simple gate could allow more or less ocean water in through the Pass, as conditions demanded. With ferocious rainstorms to the north and west, opening the gate would bring some salty water to the rescue.  In times of drought, closing or at least narrowing the gate might be prudent to compensate for less fresh water entering the bay.  The Corps, which has designed hundreds of such gates for dams and canal locks over the years, could not consider installation of such a gate to be too difficult. As to operating a gate, practical science again provides a ready answer: two meters for salinity, one at each end of the Pass, could be designed to recognize a salinity difference which would dictate action. Probably a horn, like dams use, also would be a good idea.  Maybe no one put this simple proposition to the Corps during permit review, but if that was the situation, the Corps surely could have drawn on its own experience and knowledge if alternatives were really being considered.

Without belaboring the details further, the Plaintiffs-Appellants maintain that summary judgment on the alternatives issue was inappropriate.

## C. Harm and Remedy

The harm and remedy analysis is the same as for Point of Error One, and it is incorporated here by reference.

## CONCLUSION

Wherefore the Plaintiffs-Appellant prays that the summary judgment of the United States District Court be reversed and this cause be remanded for further proceedings on the merits.

Respectfully submitted,

/s/ Winston Earle Cochran, Jr.

Winston Earle Cochran, Jr.

Attorney at Law

Texas Bar No. 04457300

P.O. Box 2945

League City, TX 77574

Tel. (713) 228-0264

E-mail: winstoncochran@comcast.net

Attorney for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 8,256 words, even without excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii). This brief complies with the

typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of

Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced

typeface using WordPerfect in Times New Roman 14-point font for text and 12-point

font for footnotes.

/s/ Winston Earle Cochran, Jr.
Winston Earle Cochran, Jr.

## CERTIFICATE OF SERVICE

I certify that a copy of this brief will be electronically served on counsel for the

Defendants-Appellees at the following address on July 15, 2016:

John E. Arbab
U.S. Department of Justice
Environment & Natural Resources Division
Appellate Section
P.O. Box 7415
Washington, DC 20044
E-mail: john.arbab@usdoj.gov

/s/ Winston Earle Cochran, Jr.
Winston Earle Cochran, Jr.