<u>NO. 16-40181</u>

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT
------------
<u>NO. 3:13cv-00126</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

------------

**GULF COAST ROD, REEL AND GUN CLUB, INCORPORATED; GILCHRIST COMMUNITY ASSOCIATION,**

**Plaintiffs - Appellants**

**v.**

**UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL CHRISTOPHER W. SALLESE, in his official capacity as District Engineer, Galveston District United States Army Corps of Engineers; LIEUTENANT GENERAL THOMAS P. BOSTICK, in his official capacity as Commander and Chief of Engineers, United States Army Corps of Engineers; JOHN M. MCHUGH, in his official capacity as Secretary of the Army,**

**Defendants – Appellees**

--------------------------------------

### PLAINTIFFS-APPELLANTS' PETITION FOR PANEL REHEARING
--------------------------------------

Winston Earle Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
E-mail: winstoncochran@comcast.net
Counsel of Record for Plaintiffs-Appellants

# TABLE OF CONTENTS

Table of Authorities                                                                    ii

Jurisdictional Statement                                                                1

Statement of the Case                                                                   2

Reasons for Rehearing                                                                   2

Factual Background                                                                      3

Summary of the Argument                                                                 4

Arguments Supporting Reasons for Rehearing                                              5

    1.    The panel erred in not finding that a gate, as an alternative to
closure of Rollover Pass, should have been considered.                                  5

    2.    The panel erred in not finding that the additional freshwater
inflow from the Needmore Diversion Canal should have been
considered in an adequate model of salinity changes.                                   10

    3.    This cause should be remanded to the Corps of Engineers for
consideration of factors not considered by the Corps at the time
the permit was issued.                                                                 11

Prayer for Relief                                                                      15

Certificate of Compliance                                                             15

Certificate of Service                                                                16

Attachment: Panel Opinion, January 19, 2017

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*,
    2016 WL 3180643 (E.D. La., June 8, 2016)                              11-12

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*,
    2016 WL 7476173 (E.D. La., Dec. 29, 2016)                              12

*Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453 (5th Cir. 2005)                                  3

*Hough v. Marsh*, 557 F.Supp.74 (D. Mass. 1982)                                              8

*Northwest Environmental Advocates v. National Marine Fisheries Service*,
    460 F.3d 1125 (9th Cir. 2006)                                           12

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983)                                        12-13

*Taylor v. Charter Med. Corp.*, 162 F.3d 827. 829 (5th Cir. 1998)                            4

*Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519,
    98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)                                   13

**Rules**

FED. R. EVID. 201                                                                            3

**Official Publications and News Reports**

GALVESTON DAILY NEWS, "Panel values Rollover Pass at
    $1.6M, litigation set to continue, June 29, 2016,' pp. A1 and A4       2

GALVESTON DAILY NEWS, "State passes new oystering rules,"
    August 30, 2016, pp. A1 and A6                                          10-11

US Army Corps of Engineers, New Orleans District, "Morganza Floodway
    Proposed Clarifications to Standing Instructions," at
    http://www.mvn.usace.army.mil/Missions/Mississippi-River-
    Flood-Control/Morganza/Floodway-Overview/                                7

US Army Corps of Engineers, New Orleans District, "Spillway Operations
    Effects," at http://www.mvn.usace.army.mil/Missions/Mississippi-
    River- Flood-Control/Bonnet-Carre-Spillway-Overview/Spillway-
    Operation-Information/                                                    7

**TO THE HONORABLE COURT OF APPEALS:**

COME NOW the Plaintiffs-Appellants, Gulf Coast Rod, Reel, and Gun Club, Inc. (hereinafter the "Club") and the Gilchrist Community Association (hereinafter the "GCA"), through the undersigned attorney, and respectfully requests that this Court grant rehearing in this cause, and that the panel either: (1) reverse the judgment of the district court and hold that the Defendants-Appellees issued a permit for the closure of Rollover Pass in violation of applicable law, which implicitly requires further Corps review unless the permit application is withdrawn, or (2) remand this cause to the Corps of Engineers for the Corps' reconsideration of the permit in light of factors not considered at the time the permit was issued. In support of these requests, the Plaintiffs-Appellants submit the following arguments and authorities.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the Southern District of Texas, Galveston Division, over which this Court has appellate jurisdiction.  A panel of this Court affirmed the district court judgment in a per curiam opinion on January 19, 2017. A motion for rehearing is timely and extends the jurisdiction of this Court if filed on or before March 6, 2017.

## STATEMENT OF THE CASE

This suit arises from a decision by the United States Army Corps of Engineers (hereinafter the "Corps") to issue a permit which would authorize the General Land Office of Texas (hereinafter the "GLO") to close a waterway in Gilchrist, Texas known as Rollover Pass. After the Corps issued the permit, the Plaintiffs-Appellants brought suit in the United States District Court for the Southern District of Texas, Galveston Division. Originally Jerry Patterson, who was the Land Commissioner of Texas at that time, and the GLO itself also were named as defendants in the litigation. The GLO and Commissioner Patterson were subsequently dropped from the suit, although the GLO remains the primary interested party behind the controversy.[1]

Both sides sought summary judgment. On December 4, 2015 the judge of the district court granted judgment for the Defendants-Appellees. The Plaintiffs-Appellants timely filed notice of appeal. A panel of this Court upheld the district court's decision.

---

[1] The Commissioners Court of Galveston County, Texas also became an interested party when that body instigated eminent domain proceedings against the property on which Rollover Pass is located. *See* GALVESTON DAILY NEWS, "Panel values Rollover Pass at $1.6M, litigation set to continue," June 29, 2016, pp. A1 and A4. Texas law does not give the GLO its own eminent domain authority, but Galveston County proposes to use its eminent domain power and then hand Rollover Pass over to the GLO. Those proceedings are in the discovery stage, and there is an active dispute about whether or not the County's proposed action meets the requirement of serving a public purpose. In reality, Galveston County's eminent domain proceeding is a subterfuge on behalf of the GLO.

## REASONS FOR REHEARING

The  Plaintiffs-Appellants urge rehearing for three reasons:

1.     The panel erred in not finding that a gate, as an alternative to closure of Rollover Pass, should have been considered.

2.     The panel erred in not finding that the additional freshwater inflow from the Needmore Diversion Canal should have been considered in an adequate model of salinity changes.

3.     This cause should be remanded to the Corps of Engineers for consideration of factors not considered by the Corps at the time the permit was issued.

## FACTUAL BACKGROUND

In the interest of brevity, the factual discussion from the original brief for the Plaintiffs-Appellants is incorporated here by reference.  In addition, under FED. R. EVID. 201 this Court may take judicial notice of Corps of Engineers publications on the Internet which are discussed below. *See Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005)(appellate judicial notice of National Mediation Board).

The panel also may, and should, take judicial notice of some events occurring after the permit was issued which shed additional light on the issues underlying the permit request.  This Court may take notice of an "adjudicative fact" which is "not

3

subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot be questioned." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998). Some recent matters which were not part of the district court record, due to their timing, are mentioned herein.

## SUMMARY OF THE ARGUMENT

The first reason for rehearing concerns the Corps' failure to adequately consider the alternative of installing a gate at Rollover Pass, such that the flow could be controlled. The panel's reasons for rejecting this argument should be reconsidered. There is an unsettled legal question here as to whether the usual requirement of presentation of ideas in public comments at a permit hearing should apply to technical matters well within the agency's existing expertise. No one needed to take the Corps of Engineers to school on the use of a gate in hydrological engineering. The panel also noted no formal presentation of the argument to the district court, but that should not be construed as a waiver or forfeiture, because that problem was simply a consequence of the inadequate consideration of a gate in the permit review. Third, the panel seems to have confused a gate, which completely precludes water flow when closed, with a weir, which only limits or alters a flow.

The second reason for rehearing concerns the inadequate consideration of the

increased freshwater flow from the Needmore flood-control canal. This factor was brushed off by the Corps with the dubious logic that flooding would bring lots of fresh water from other directions after heavy rains, with or without the Needmore flow. The Corps' duty to review modeling inputs is not satisfied by simply hypothesizing that "it won't matter anyway." That does not reflect the kind of careful review which entitles administrative action to judicial deference.

The third and most important reason for rehearing is the procedural superiority, and the superior achievement of justice, which would result from ordering the Corps to conduct further hearings, at least concerning the gate issue and the Needmore issue. This Court has the authority to abate the case while a reasonable time is taken for such further agency review. Probably that should be done under the supervision of the district court.

## ARGUMENTS SUPPORTING REASONS FOR REHEARING

## I.

**The panel erred in not finding that a gate, as an alternative to closure of Rollover Pass, should have been considered.**

An important part of the Corps' permit process is the consideration of alternatives to any proposed project which will affect navigable waters. The Club and the GCA have argued *inter alia* that the supposed evils caused by Rollover Pass could

be ameliorated, either completely or in large part, by remedial measures which could be taken while allowing Rollover Pass to remain open, albeit with modifications.

The simplest among the alternatives is a gate system, in which a gate across Rollover Pass could be opened and closed in order to achieve greater or lesser flow. The panel's reasons for rejecting this argument deserve reconsideration.  The evils attributed to Rollover Pass might be largely negated by simply closing off the Pass during an incoming tide, while maintaining the considerable advantages of providing a good fishing spot, promoting local business, and helping to relieve an influx of floodwaters.

The panel first pointed out that the hearing record did not show that a gate proposal was squarely presented to the Corps as an alternative. This is a situation, however, in which the customary obligation of parties to present specific arguments during the permit review process should not be applied in a rigid manner. There is a fundamental difference between proposals which draw their strength from knowledge of localized facts and proposals which draw their strength from general scientific principles, already are well known to the permit-issuing agency.  The former category necessarily calls for public input, but the latter does not.

Hydrological engineering is a science.  Among the most adept scientists and engineers in that field are those employed by the United States Army Corps of

Engineers.  In the 1800's, Army engineer Robert E. Lee saved the port of St. Louis by devising methods to channel the Mississippi River.  While Lee did not utilize a gate, his 20th Century successor used dams and gates as part of massive engineering of that river.  Below Memphis, the Mississippi River has a massive levee system making extensive use of gates, allowing the Corps to control river depth and prevent flooding. At the Morganza Control Structure, operated by the Corps, multiple gates can be opened to deal with a flow of up to 1,500,000 cubic feet of water per second – a quantity vastly greater than tidal movements at Rollover Pass. *See* US Army Corps of Engineers, New Orleans District, "Morganza Floodway Proposed Clarifications to Standing Instructions," at   http://www.mvn.usace.army.mil/Missions/Mississippi-River-Flood-Control/Morganza/Floodway-Overview/.   Closer to New Orleans, the Bonnet Carre Spillway is designed to handle a flow of 250,000 cubic feet per second. *See* US Army Corps of Engineers, New Orleans District, "Spillway Operational Effects,"   at   http://www.mvn.usace.army.mil/Missions/Mississippi-River-Flood-Control/Bonnet-Carre-Spillway-Overview/Spillway-Operation-Information/. The city of New Orleans itself relies on a complex system of canals which includes gates.

On the anniversary of Lee's birthday, *i.e.* January 19, 2017, this Court essentially held that the Corps of Engineers had to be told by outsiders that it should consider the use of a gate in controlling the tidal flow at Rollover Pass.  That is like

saying that the FBI needs to be told by private citizens how to fight crime.  Instead of placing such a burden on permit opponents, this Court should recognize a difference between (1) local situations which may elude the Corps' notice without having them pointed out by knowledgeable outsiders, and (2) scientific information and related engineering techniques which already are well known to the Corps of Engineers.  An example of the former is found in *Hough v. Marsh*, 557 F.Supp.74 (D. Mass. 1982), where one effect of a permit for recreational filling and construction on Nantucket Island would have been to impair the view of a picturesque lighthouse which was enjoyed by visitors on tour buses. Who outside of Nantucket would know how important that particular vista was? In contrast, when the question is how to keep water from flowing in a particular direction at certain times, the Corps' personnel are the masters, not the students.

Given that reality, the absence of a clear discussion in the administrative record of the feasibility of a gate system should cut in favor of the Plaintiffs-Appellants.  It is inconceivable that the Corps does not already have very reliable data on how to measure water flows, the relationship of water flows to tidal changes, and so forth. Compared to the levee and gate system on the Mississippi River, designing a gate for Rollover Pass should be child's play.

The perceived evils, *i.e.*, beach erosion, sand in the Intracoastal Waterway, and

salinity in East Bay obviously are attributable to incoming tides, such that water flows from the Gulf to the Bay. The Corps' personnel surely know when a gate would need to be closed in order to avert those evils. For the most part, correlation of the closing of the gate with local tide charts would do the trick.[2] With modern engineering techniques, operation by a live person at the site would not even be needed.

A second obstacle to the argument, the Court noted, is that the Plaintiffs-Appellants did not specifically argue for a gate in their presentations to the district court. But agency-decision review is a type of case in which the record which is considered by a district court judge is limited, so a shortcoming in discussion of a gate at the district-court stage is really just a consequence of the state of the record in the administrative proceedings. Permit opponents should not be assigned the burden, during judicial review, of pointing out engineering concepts and methods which already are within the Corps' toolkit of knowledge. Therefore it is not really a question of waiver of an argument (or more precisely, forfeiture of it).

The panel also regarded the gate solution as being the functional equivalent of some modified form of an existing weir at Rollover Pass. That is incorrect. The

---

[2]     For "belt and suspenders" protection, two salinity gauges – one in the bay, one at the Gulf entrance to the Pass – could be installed to identify salinity differentials which might be problematic to bay aquatic life. Such monitoring might demonstrate that the ability to add salty water to a flooded bay, using Rollover Pass as a conduit, is an asset in environmental management.

existing weir allows continuing flow of water.  There is no point at which flow through the Pass actually would be stopped by a weir.  Hence the perceived evils may occur on an incoming tide will continue with a weir in place unless it is modified to the extent of being a wall or a gate.  In contrast, a solid gate could be closed, partly or entirely, during the incoming tide, and then opened when appropriate.[3]

## II.

**The panel erred in not finding that the additional freshwater inflow from the Needmore Diversion Canal should have been considered in an adequate model of salinity changes.**

The second reason for rehearing concerns the inadequate consideration of the increased freshwater flow from the Needmore Diversion flood-control canal. The purpose of that canal is to channel floodwaters from the Beaumont area to East Galveston Bay, with the aim of sparing lower Jefferson County from flooding.[4]

An excessive inflow of fresh water jeopardizes marine life in the bay,

---

[3] Since little or no attention was paid to a gate, there was no hydrological modeling which included the effects of a gate.

[4] Lower Jefferson County is the location of many refineries, petrochemical plants, and shipping facilities.  Busy highways and railroads pass through the area. Keeping that area safe from excessive flooding makes sense.  But assuming *arguendo* that East Galveston Bay is the best place to send the water, it makes more sense to keep the Pass open, as a supplemental outlet to the Gulf, rather than having all of the flood waters need to go all the way to Port Bolivar before discharging into the Gulf.

particularly oysters. That became particularly noteworthy in 2016, after the Corps' permit decision was made. The GALVESTON DAILY NEWS, "State passes new oystering rules," August 30, 2016, pp. A1 and A6, summarized the plight of the oysters and oystermen:

> Texas' oysters have taken a succession of hits in recent years. First it was Hurricane Ike in 2008, which dumped sediment over the bay floor; then prolonged drought, which made the water too salty. Flooding and heavy rains have delivered the most recent beating to oysters.

In 2016, oystering interests in Galveston Bay actually sought economic aid due to excessive freshwater input. Oysters are, after all, saltwater creatures. Closing Rollover Pass would aggravate the problem of inadequate salinity during heavy runoff.

The Plaintiffs-Appellants challenged the Corps' reliance on modeling which failed to consider a periodic strong freshwater influx from the Needmore canal. The panel accepted the Corps' reasoning that "it won't matter" because Needmore inflow would occur when flood waters were pouring into the Galveston Bay from other directions anyway. This was an error in simple logic. If a heavy freshwater input is bad, an even heavier input logically should be worse – unless the input without Needmore would be a fatal event so that there were no more living oysters left to be killed by Needmore inflow. Such a dire prospect would call for salt water to the rescue, and a good way to deliver it would be to open wide a gate at Rollover Pass.

Ultimately the panel accepted the Corps' limited study because it was not "arbitrary or capricious," but the better question is whether the "hard look" requirement for such review was met. The study effort paled in comparison to that which represented a "hard look" in *Northwest Environmental Advocates v. National Marine Fisheries Service*, 460 F.3d 1125 (9th Cir. 2006).

## III.

**This cause should be remanded to the Corps of Engineers for consideration of factors not considered by the Corps at the time the permit was issued.**

This Court also should consider an alternative approach which would allow the Corps to reconsider the permit in light of better information. This is achieved by a remand with instructions to the Corps to gather the additional information, accompanied by a temporary stay of court proceedings. It probably makes sense to return jurisdiction to the district court for purposes of supervision, but the important point is to get the Corps to take a second look.

Returning the permit question to the Corps for further examination is not a common practice, but it is not a rarity either. This approach was taken, for example, in *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 2016 WL 3180643 (E.D. La., June 8, 2016), although an extension of the stay, requested by the Corps was

12

not granted six months later. *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 2016 WL 7476173 (E.D. La., Dec. 29, 2016).[5]  In *Sierra Club v. Sigler*, 695 F.2d 957, 983 (5th Cir. 1983), this Court similarly required a remand "to the Corps for reconsideration in light of the corrected FEIS."  This Court noted in *Sigler* that it was entirely possible that the Corps would reach the same conclusion, but it would be doing so after adequate consideration of the factors in dispute.

*Sigler* recognized that there had to be some finality, and administrative review could not be routinely prolonged simply because "some new circumstance has arisen, some new trend been observed, or some new fact discovered." *Id.*, at 984, quoting from *Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 554-5, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). But neither can important factors be overlooked in the interest of finality, particularly when additional valuable information could lead to a wiser decision.  Important factual questions, including but not limited to the issues described in Parts I and II above, have not been given fair consideration by the Corps. Equally important, the Corps should be asked to consider a number of developments occurring since the time of the original permit review.  Three examples are offered below.

---

[5]  Those district court decisions are not binding precedent, in this Court or in another federal district court, but they are illustrations of the possible use of the remand process and the utilization of that process with respect to the Corps of Engineers in particular.

First, if the Corps has any doubts on the merits of a gate, it can look for guidance to the "Ike Dike" proposal made by scientists at Texas A&M University. As early as 2012, these scientists proposed a dike along the coastline, at least from San Luis Pass to High Island, with a massive gate at Bolivar Roads. This idea is not a pie-in-the-sky proposal, but instead was inspired by the dike and gate system already used to protect Rotterdam. Bolivar Roads is far wider and deeper than Rollover Pass. If a gate will work at Bolivar Roads, it will work at Rollover Pass.

If Aggie engineers are not good enough, add some Rice University scholars as well. The GALVESTON DAILY NEWS, "University proposes new Galveston Bay storm surge plan," September 2,2015, pp. A1 and A3, reported that a Rice affiliate called the Severe Storm Prediction, Education and Evacuation from Disasters Center had "propose[d] a new version of plans to use flood gates to protect the Galveston Bay area from damaging storm surge caused by hurricanes."

The "Ike Dike" idea recently became the topic of proposed Texas legislation which would authorize a study. The current Land Commissioner, George P. Bush, recently spoke to the current session of the Texas Legislature in favor of conducting such a study, with a target completion date in 2020. The use of gates, the control of freshwater inputs, and how a dike would affect Bolivar Peninsula all should be topics for discussion in that study. If 2020 is a realistic target date for a study, why should

14

there be a hurry to close Rollover Pass?

The point is that continued Corps review, with updated and more reliable information, is highly likely to improve the ultimate permitting decision and, with it, the future of Rollover Pass and the people who benefit from it.

## PRAYER FOR RELIEF

Wherefore the Plaintiffs-Appellants pray that rehearing be granted and that the Corps be directed to conduct further hearings and review.

Respectfully submitted,

/s/ Winston Earle Cochran, Jr.
Winston Earle Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
E-mail: winstoncochran@comcast.net

Counsel of Record for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitation of Fed.R.App.P. 40(b)(1) because it contains 3461 words, excluding parts exempted from the word limitation. This petition complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.RApp.P. 32(a)(6) because it has been prepared in

a proportionally spaced typeface using WordPerfect in Times New Roman 14-point font for text and 12-point font for footnotes.

<u>/s/ Winston Earle Cochran, Jr.</u>
Winston Earle Cochran, Jr.

## **CERTIFICATE OF SERVICE**

I certify that a copy of this petition will be electronically served on counsel for the Defendants-Appellees at the following address on March 6, 2017:

John E. Arbab
U.S. Department of Justice
Environment & Natural Resources Division
Appellate Section
P.O. Box 7415
Washington, D.C. 20044
E-mail: john.arbab@usdoj.gov

<u>/s/ Winston Earle Cochran, Jr.</u>
Winston Earle Cochran, Jr.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 16-40181
Summary Calendar

———————

United States Court of Appeals
Fifth Circuit

**FILED**

January 19, 2017

Lyle W. Cayce
Clerk

GULF COAST ROD, REEL AND GUN CLUB, INCORPORATED;
GILCHRIST COMMUNITY ASSOCIATION,

      Plaintiffs - Appellants

v.

UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL
CHRISTOPHER W. SALLESE, in his official capacity as District Engineer,
Galveston District United States Army Corps of Engineers; LIEUTENANT
GENERAL THOMAS P. BOSTICK, in his official capacity as Commander
and Chief of Engineers, United States Army Corps of Engineers; JOHN M.
MCHUGH, in his official capacity as Secretary of the Army,

      Defendants - Appellees

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:13-CV-126

———————

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit
Judges.

No. 16-40181

PER CURIAM:[*]

This case involves a challenge to the issuance of a Clean Water Act ("CWA") permit under the Administrative Procedure Act ("APA"). Appellants oppose the decision by the U.S. Army Corps of Engineers (the "Corps") to issue a permit allowing Texas's General Land Office (the "GLO") to close Rollover Pass, a man-made channel that connects East Bay and the Gulf of Mexico. Appellants' claims on appeal concern whether the permitting process fulfilled the requirements of the National Environmental Policy Act ("NEPA"). After the parties submitted dueling motions for summary judgment, the district court granted summary judgment in favor of the Corps. We AFFIRM.

## I. FACTUAL & PROCEDURAL HISTORY

Rollover Pass cuts through the Bolivar Peninsula and connects East Bay, an extension of Galveston Bay, to the Gulf of Mexico. In 1955, Texas dug Rollover Pass to allow fish and salt water from the Gulf of Mexico to more easily enter the bay. Due to the large number of fish that pass through the channel and its accessibility, Rollover Pass has become a popular destination for fishers. For decades, however, studies have shown that the pass has caused increased erosion along the peninsula. When Hurricane Ike devastated the area in 2008, the Texas Legislature appropriated money to close the pass to better protect the coast from erosion and environmental damage. The GLO commissioned a study on the impact of closing Rollover Pass, and the Corps adopted that study into their Environmental Assessment and Statement of Findings ("EA"). The GLO received a CWA Section 404 permit from the Corps to close Rollover Pass in 2012.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40181

Two organizations challenged the Corps' issuance of the permit under the APA.[1]  First is Gulf Coast Rod, Reel, and Gun Club, Inc., a recreational organization that owns the land through which Rollover Pass was built. Second is Gilchrist Community Association, a local civic group that helps maintain the fishing facilities at Rollover Pass (collectively, "Appellants"). Relevant to this appeal, the suit alleged that the Corps' EA was deficient under NEPA in two respects: (1) the EA failed to fully assess the cumulative impact that closing Rollover Pass would have on the salinity[2] of East Bay, and (2) the EA did not adequately consider alternatives to closing the pass.  Appellants sought to supplement the administrative record, and the district court allowed in some of the additional documents but not all.  The district court's decision to supplement the record is not on appeal.

Both sides filed motions for summary judgment.  After considering the cross-motions, the district court denied the Appellants' motion and granted summary judgment in favor of the Corps.  This appeal followed.

## II. STANDARD OF REVIEW

We "review[] a grant of summary judgment *de novo*, applying the same standards as the district court." *Amrollah v. Napolitano*, 710 F.3d 568, 570 (5th Cir. 2013).  The standard governing the Corps' issuance of a Section 404 permit is set forth in the APA.  *See City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005).  Under the APA, the agency's decision will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also La. Crawfish Producers Ass'n–W. v. Rowan*, 463 F.3d 352, 355 (5th Cir. 2006).  Federal Rule of Civil Procedure 56 provides the standard for summary judgment, but it is well

---

[1] Appellants also brought suit against the GLO and its commissioner but stipulated to their dismissal from the suit prior to the district court's final disposition of this case.

[2] Salinity is the concentration of dissolved salt in a body of water.

settled that on a motion for summary judgment concerning agency action, the agency—not the court—is the fact finder. *See, e.g.*, *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 & n.17 (5th Cir. 1996)(quoting 10A Charles Allen Wright et al., *Federal Practice and Procedure*, § 2733 (2d ed. 1983)). Because of the technical nature of an agency's decision, "[w]e must look at the decision not as a chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) (quoting *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). "This deferential standard of review applies regardless of whether we are reviewing the Corps' decision under the CWA or NEPA." *City of Shoreacres*, 420 F.3d at 445.

Appellants contend that the district court—relying on a district court case, *City of Shoreacres v. Waterworth*—misapplied the summary judgment standard because it considered the administrative record as a whole, without reweighing evidence. *See* 332 F. Supp. 2d 992, 1004 (S.D. Tex. 2004) *aff'd*, 420 F.3d 440 (5th Cir. 2005). Appellants submit that the district court applied a summary judgment standard that was too deferential. The case cited by the district court echoes the principle that when reviewing agency action, the court's "mandate is not to 'weigh the evidence pro and con but to determine whether the agency decision was based on a consideration of relevant factors and whether there was a clear error of judgment.'" *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008)(quoting *Delta Found, Inc. v. United States*, 303 F.3d 551, 562 (5th Cir. 2002)). Appellants "present[] no compelling argument for changing this practice, [and] we decline the invitation to do so." *Girling*, 85 F.3d at 215.

## III. ANALYSIS

### 1. *Cumulative Impact on Salinity Level*[3]

Appellants first allege that the Corps failed to properly consider the cumulative impact that closing Rollover Pass would have on salinity levels. They aver that better scientific models were available than those adopted by the Corps. Instead of looking at multiseasonal averages of salinity, Appellants insist the Corps should have considered daily changes, as the existing TxBLEND model does. Further, the Corps allegedly failed to take into account the new Needmore Diversion's impact, which will channel freshwater from Beaumont into East Bay upon completion. At bottom, Appellants believe these shortcomings led the Corps to overestimate the salinity of East Bay after the pass is closed, which could have negative impacts on aquatic species living in the bay.

Ordinarily, before issuing a Section 404 permit, NEPA requires that the Corps prepare an Environmental Impact Statement ("EIS"). However, an EA may be prepared in order to determine whether the proposed action is significant enough to warrant an EIS. 40 C.F.R. § 1501.4. If the EA concludes with a Finding of No Significant Impact, then the Corps has no further obligations under NEPA. *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 479 (5th Cir. 2016). The EA must assess the environmental

---

[3] We note that Appellants' brief is devoid of any citation to the administrative record. Instead, Appellants cite primarily to their Amended Complaint, which the district court struck prior to the filing of summary judgment—a ruling that they do not appeal. Because Appellants fail to cite to portions of the record that support their claims, this court could conclude that Appellants have waived these issues. *See* Fed. R. App. P. 28(a)(8)(A); *JTB Tools & Oilfield Servs., LLC v. United States*, 831 F.3d 597, 601 (5th Cir. 2016). Nonetheless, we may consider such issues at our discretion. *See United States v. Miranda*, 248 F.3d 434, 443–44 (5th Cir. 2001). We address each issue raised in turn.

impacts of a proposed action, including its cumulative impacts.[4]  *See La. Crawfish Produces*, 463 F.3d at 357–58; 40 C.F.R. § 1508.9.  "Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence."  *Sabine River Auth. v. U.S. Dep't of the Interior*, 951 F.2d 669, 678 (5th Cir. 1992).  Here, the Corps' EA concluded that the closing of Rollover Pass did not create a significant impact as defined by NEPA and that its salinity model was sufficient.  We agree.

With regard to the Corps' decision to use seasonal—instead of daily— averages of freshwater entering the bay, the Corps considered and rejected using a daily model.  It explained that the seasonal model "provided results not subject to local anomalies and episodic events which would obscure the more relevant trends with transient excursions."  Further, the seasonal models were less expensive and time consuming to construct than a model using daily data. The Corps' model also took into account a significant amount of data that spanned more than seventy years.  Because the Corps' choice of model was reasoned and deliberate, we cannot say that it acted arbitrarily or capriciously. *See La. Crawfish Producers*, 463 F.3d at 355.

Additionally, the Corps responded to concerns that the model failed to account for certain freshwater inflows into the bay.  The Corps acknowledged this limitation, but it concluded that other freshwater sources would not have a significant impact on the study.  This is because the freshwater sources already included make up the vast majority of all freshwater flowing into the bay.  For instance, the Trinity River alone accounts for sixty to seventy percent

---

[4] *See* 40 C.F.R. § 1508.7 (defining cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time").

of all freshwater entering the system. However, in response to public comments, the study expanded the area that was modeled to more accurately assess the salinity level. Even after taking into account this larger area, the Corps still concluded that salinity would remain within an acceptable range.

Concerning the Needmore Diversion specifically, the Corps chose not to account for it because it "is not expected to have any appreciable impact on [] salinity." The Corps explained that the diversion will only operate "intermittently" and "during times of regionally heavy rainfall." Since the diversion would only operate during periods of heavy rainfall, all other freshwater inflows would increase too, so the model already accounts for these short periods of reduced salinity.

As the district court noted, even though the model proposed by Appellants "may well be better, the Corps has provided reasoned justifications for why it chose its model[,] and it did . . . consider freshwater inflows." *See Sabine River Auth.*, 951 F.2d at 678 (stating that the agency has discretion when choosing from sources of evidence). The Corps' extensive consideration of the cumulative impact closing the pass could have on East Bay's salinity convinces us that the agency's action was not arbitrary or capricious. *See La. Crawfish Producers*, 463 F.3d at 355.

### 2. *Practicable Alternatives*

Appellants additionally claim that the district court erred when it held that the Corps adequately considered alternatives to closing Rollover Pass. NEPA requires that proposals "affecting the quality of the human environment" contain a detailed statement of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii). Regulations make it clear that this requirement applies to an EA. 40 C.F.R. § 1508.9(b). "An alternative is practicable if it is available and capable of being done after taking into

consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

The purposes for the project must not be so narrow that they foreclose the consideration of reasonable alternatives. *See Sierra Club v. Fed. Highway Admin.*, 435 F. App'x 368, 374 (5th Cir. 2011). Here, the Corps condensed the project purposes into four objectives that any alternative must also meet: (1) present a long-term solution for beach erosion in the area of Rollover Pass; (2) eliminate sediment transport into East Bay and Rollover Bay; (3) return the area to its more natural salinity regime; and (4) effectively stabilize the fill material, minimize water quality impacts, minimize impacts to existing bridges and utilities, and use compatible fill materials.[5]

Appellants focus on two alternatives they allege were not considered in the Corps' analysis: (1) the construction of jetties and (2) the construction of a gate at the mouth of Rollover Pass. The Corps considered and rejected six alternatives to closing Rollover Pass, including one no-action alternative. In each case, the Corps found that at least one of the stated purposes of the project would not be met.

The Corps explained that it did not consider the use of jetties as an alternative because the GLO had considered—and rejected—the use of jetties

---

[5] Appellants argued before the district court that the Corps had "define[d] the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action." *Sierra Club*, 435 F. App'x at 374 (quotation omitted). Aside from a couple of unbriefed, summary allegations, Appellants do not appear to raise this issue on appeal. And even these unbriefed allegations are equivocal as to whether Appellants are seeking review of this issue. Appellants do not urge us to reconsider the breadth of the stated goals, nor do they point us to any authority for the proposition that these goals were impermissibly restrictive. Issues not adequately briefed are waived. *See United States v. Elashyi*, 554 F.3d 480, 494 n.6 (5th Cir. 2008). In any event, we consider the district court's analysis of these goals thorough and agree that "[n]othing in the record suggests that [these objectives were] artificially narrowed in order to defeat potential alternatives."

prior to its application for a Section 404 permit.  The Corps agreed with the GLO's conclusion that "jetties would have built up sand on one side and starved the other side of sand; shunting the excess sand into offshore waters and away from the beach."  This court has upheld as adequate a consideration of alternatives that were proposed but rejected at a preliminary stage, even when reviewing the more rigorous EIS.  *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000).

The other alternative suggested by Appellants is constructing a gate at the mouth of Rollover Pass.  It is not clear that this alternative was ever proposed to the Corps.  Indeed, Appellants concede that "[m]aybe no one put this simple proposition to the Corps during permit review."  Parties challenging compliance with NEPA must structure their participation to alert the agency to their position in order "to allow the agency to give the issue meaningful consideration," unless a flaw is so obvious that there is no need to point out the shortcoming.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–765 (2004).  Regardless, Appellants did not raise the possibility of constructing a gate before the district court, so we need not consider it.  *See Hardman v. Colvin*, 820 F.3d 142, 152 (5th Cir. 2016)(stating that when reviewing a grant of summary judgment, we generally do not review matters not presented to the district court).  Additionally, we note that the construction of a gate is similar to the modification of an existing weir,[6] which the Corps rejected because it "would not prevent sedimentation from entering the pass," and it "would not result in [the] desired lowering of salinity or improvement of water quality."

"Although the relevant regulation does mandate the discussion of alternatives, the regulation does not require that *all* proposed alternatives, no matter their merit, be discussed in the EA." *La. Crawfish Producers*, 463 F.3d

---

[6] A low dam built to regulate the level and flow of water.

No. 16-40181

at 356 (citing 40 C.F.R. § 1508.9(b)).  The Corps considered and rejected a number of alternatives to closing Rollover Pass.  Thus, we conclude that its decision to issue a permit for closing the pass was not arbitrary or capricious. *See La. Crawfish Producers*, 463 F.3d at 355.

## IV. CONCLUSION

The district court's grant of summary judgment in favor of the Corps is AFFIRMED.