# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-40181
Summary Calendar

United States Court of Appeals
Fifth Circuit
**FILED**
January 19, 2017

Lyle W. Cayce
Clerk

GULF COAST ROD, REEL AND GUN CLUB, INCORPORATED; GILCHRIST COMMUNITY ASSOCIATION,

      Plaintiffs - Appellants

v.

UNITED STATES ARMY CORPS OF ENGINEERS; COLONEL CHRISTOPHER W. SALLESE, in his official capacity as District Engineer, Galveston District United States Army Corps of Engineers; LIEUTENANT GENERAL THOMAS P. BOSTICK, in his official capacity as Commander and Chief of Engineers, United States Army Corps of Engineers; JOHN M. MCHUGH, in his official capacity as Secretary of the Army,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:13-CV-126

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit Judges.

No. 16-40181

PER CURIAM:[*]

This case involves a challenge to the issuance of a Clean Water Act ("CWA") permit under the Administrative Procedure Act ("APA"). Appellants oppose the decision by the U.S. Army Corps of Engineers (the "Corps") to issue a permit allowing Texas's General Land Office (the "GLO") to close Rollover Pass, a man-made channel that connects East Bay and the Gulf of Mexico. Appellants' claims on appeal concern whether the permitting process fulfilled the requirements of the National Environmental Policy Act ("NEPA"). After the parties submitted dueling motions for summary judgment, the district court granted summary judgment in favor of the Corps. We AFFIRM.

## I. FACTUAL & PROCEDURAL HISTORY

Rollover Pass cuts through the Bolivar Peninsula and connects East Bay, an extension of Galveston Bay, to the Gulf of Mexico. In 1955, Texas dug Rollover Pass to allow fish and salt water from the Gulf of Mexico to more easily enter the bay. Due to the large number of fish that pass through the channel and its accessibility, Rollover Pass has become a popular destination for fishers. For decades, however, studies have shown that the pass has caused increased erosion along the peninsula. When Hurricane Ike devastated the area in 2008, the Texas Legislature appropriated money to close the pass to better protect the coast from erosion and environmental damage. The GLO commissioned a study on the impact of closing Rollover Pass, and the Corps adopted that study into their Environmental Assessment and Statement of Findings ("EA"). The GLO received a CWA Section 404 permit from the Corps to close Rollover Pass in 2012.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-40181

Two organizations challenged the Corps' issuance of the permit under the APA.[1] First is Gulf Coast Rod, Reel, and Gun Club, Inc., a recreational organization that owns the land through which Rollover Pass was built. Second is Gilchrist Community Association, a local civic group that helps maintain the fishing facilities at Rollover Pass (collectively, "Appellants"). Relevant to this appeal, the suit alleged that the Corps' EA was deficient under NEPA in two respects: (1) the EA failed to fully assess the cumulative impact that closing Rollover Pass would have on the salinity[2] of East Bay, and (2) the EA did not adequately consider alternatives to closing the pass. Appellants sought to supplement the administrative record, and the district court allowed in some of the additional documents but not all. The district court's decision to supplement the record is not on appeal.

Both sides filed motions for summary judgment. After considering the cross-motions, the district court denied the Appellants' motion and granted summary judgment in favor of the Corps. This appeal followed.

## II. STANDARD OF REVIEW

We "review[] a grant of summary judgment *de novo*, applying the same standards as the district court." *Amrollah v. Napolitano*, 710 F.3d 568, 570 (5th Cir. 2013). The standard governing the Corps' issuance of a Section 404 permit is set forth in the APA. *See City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005). Under the APA, the agency's decision will be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also La. Crawfish Producers Ass'n–W. v. Rowan*, 463 F.3d 352, 355 (5th Cir. 2006). Federal Rule of Civil Procedure 56 provides the standard for summary judgment, but it is well

---

[1] Appellants also brought suit against the GLO and its commissioner but stipulated to their dismissal from the suit prior to the district court's final disposition of this case.

[2] Salinity is the concentration of dissolved salt in a body of water.

settled that on a motion for summary judgment concerning agency action, the agency—not the court—is the fact finder. *See, e.g.*, *Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 215 & n.17 (5th Cir. 1996)(quoting 10A Charles Allen Wright et al., *Federal Practice and Procedure*, § 2733 (2d ed. 1983)). Because of the technical nature of an agency's decision, "[w]e must look at the decision not as a chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) (quoting *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). "This deferential standard of review applies regardless of whether we are reviewing the Corps' decision under the CWA or NEPA." *City of Shoreacres*, 420 F.3d at 445.

Appellants contend that the district court—relying on a district court case, *City of Shoreacres v. Waterworth*—misapplied the summary judgment standard because it considered the administrative record as a whole, without reweighing evidence. *See* 332 F. Supp. 2d 992, 1004 (S.D. Tex. 2004) *aff'd,* 420 F.3d 440 (5th Cir. 2005). Appellants submit that the district court applied a summary judgment standard that was too deferential. The case cited by the district court echoes the principle that when reviewing agency action, the court's "mandate is not to 'weigh the evidence pro and con but to determine whether the agency decision was based on a consideration of relevant factors and whether there was a clear error of judgment.'" *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008)(quoting *Delta Found, Inc. v. United States*, 303 F.3d 551, 562 (5th Cir. 2002)). Appellants "present[] no compelling argument for changing this practice, [and] we decline the invitation to do so." *Girling*, 85 F.3d at 215.

## III. ANALYSIS

### 1. *Cumulative Impact on Salinity Level*[3]

Appellants first allege that the Corps failed to properly consider the cumulative impact that closing Rollover Pass would have on salinity levels. They aver that better scientific models were available than those adopted by the Corps. Instead of looking at multiseasonal averages of salinity, Appellants insist the Corps should have considered daily changes, as the existing TxBLEND model does. Further, the Corps allegedly failed to take into account the new Needmore Diversion's impact, which will channel freshwater from Beaumont into East Bay upon completion. At bottom, Appellants believe these shortcomings led the Corps to overestimate the salinity of East Bay after the pass is closed, which could have negative impacts on aquatic species living in the bay.

Ordinarily, before issuing a Section 404 permit, NEPA requires that the Corps prepare an Environmental Impact Statement ("EIS"). However, an EA may be prepared in order to determine whether the proposed action is significant enough to warrant an EIS. 40 C.F.R. § 1501.4. If the EA concludes with a Finding of No Significant Impact, then the Corps has no further obligations under NEPA. *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 479 (5th Cir. 2016). The EA must assess the environmental

---

[3] We note that Appellants' brief is devoid of any citation to the administrative record. Instead, Appellants cite primarily to their Amended Complaint, which the district court struck prior to the filing of summary judgment—a ruling that they do not appeal. Because Appellants fail to cite to portions of the record that support their claims, this court could conclude that Appellants have waived these issues. *See* Fed. R. App. P. 28(a)(8)(A); *JTB Tools & Oilfield Servs., LLC v. United States*, 831 F.3d 597, 601 (5th Cir. 2016). Nonetheless, we may consider such issues at our discretion. *See United States v. Miranda*, 248 F.3d 434, 443–44 (5th Cir. 2001). We address each issue raised in turn.

impacts of a proposed action, including its cumulative impacts.[4] *See La. Crawfish Produces*, 463 F.3d at 357–58; 40 C.F.R. § 1508.9. "Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence." *Sabine River Auth. v. U.S. Dep't of the Interior*, 951 F.2d 669, 678 (5th Cir. 1992). Here, the Corps' EA concluded that the closing of Rollover Pass did not create a significant impact as defined by NEPA and that its salinity model was sufficient. We agree.

With regard to the Corps' decision to use seasonal—instead of daily—averages of freshwater entering the bay, the Corps considered and rejected using a daily model. It explained that the seasonal model "provided results not subject to local anomalies and episodic events which would obscure the more relevant trends with transient excursions." Further, the seasonal models were less expensive and time consuming to construct than a model using daily data. The Corps' model also took into account a significant amount of data that spanned more than seventy years. Because the Corps' choice of model was reasoned and deliberate, we cannot say that it acted arbitrarily or capriciously. *See La. Crawfish Producers*, 463 F.3d at 355.

Additionally, the Corps responded to concerns that the model failed to account for certain freshwater inflows into the bay. The Corps acknowledged this limitation, but it concluded that other freshwater sources would not have a significant impact on the study. This is because the freshwater sources already included make up the vast majority of all freshwater flowing into the bay. For instance, the Trinity River alone accounts for sixty to seventy percent

---

[4] *See* 40 C.F.R. § 1508.7 (defining cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time").

of all freshwater entering the system. However, in response to public comments, the study expanded the area that was modeled to more accurately assess the salinity level. Even after taking into account this larger area, the Corps still concluded that salinity would remain within an acceptable range.

Concerning the Needmore Diversion specifically, the Corps chose not to account for it because it "is not expected to have any appreciable impact on [] salinity." The Corps explained that the diversion will only operate "intermittently" and "during times of regionally heavy rainfall." Since the diversion would only operate during periods of heavy rainfall, all other freshwater inflows would increase too, so the model already accounts for these short periods of reduced salinity.

As the district court noted, even though the model proposed by Appellants "may well be better, the Corps has provided reasoned justifications for why it chose its model[,] and it did . . . consider freshwater inflows." *See Sabine River Auth.*, 951 F.2d at 678 (stating that the agency has discretion when choosing from sources of evidence). The Corps' extensive consideration of the cumulative impact closing the pass could have on East Bay's salinity convinces us that the agency's action was not arbitrary or capricious. *See La. Crawfish Producers*, 463 F.3d at 355.

### *2. Practicable Alternatives*

Appellants additionally claim that the district court erred when it held that the Corps adequately considered alternatives to closing Rollover Pass. NEPA requires that proposals "affecting the quality of the human environment" contain a detailed statement of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii). Regulations make it clear that this requirement applies to an EA. 40 C.F.R. § 1508.9(b). "An alternative is practicable if it is available and capable of being done after taking into

7

consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

The purposes for the project must not be so narrow that they foreclose the consideration of reasonable alternatives. *See Sierra Club v. Fed. Highway Admin.*, 435 F. App'x 368, 374 (5th Cir. 2011). Here, the Corps condensed the project purposes into four objectives that any alternative must also meet: (1) present a long-term solution for beach erosion in the area of Rollover Pass; (2) eliminate sediment transport into East Bay and Rollover Bay; (3) return the area to its more natural salinity regime; and (4) effectively stabilize the fill material, minimize water quality impacts, minimize impacts to existing bridges and utilities, and use compatible fill materials.[5]

Appellants focus on two alternatives they allege were not considered in the Corps' analysis: (1) the construction of jetties and (2) the construction of a gate at the mouth of Rollover Pass. The Corps considered and rejected six alternatives to closing Rollover Pass, including one no-action alternative. In each case, the Corps found that at least one of the stated purposes of the project would not be met.

The Corps explained that it did not consider the use of jetties as an alternative because the GLO had considered—and rejected—the use of jetties

---

[5] Appellants argued before the district court that the Corps had "define[d] the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action." *Sierra Club*, 435 F. App'x at 374 (quotation omitted). Aside from a couple of unbriefed, summary allegations, Appellants do not appear to raise this issue on appeal. And even these unbriefed allegations are equivocal as to whether Appellants are seeking review of this issue. Appellants do not urge us to reconsider the breadth of the stated goals, nor do they point us to any authority for the proposition that these goals were impermissibly restrictive. Issues not adequately briefed are waived. *See United States v. Elashyi*, 554 F.3d 480, 494 n.6 (5th Cir. 2008). In any event, we consider the district court's analysis of these goals thorough and agree that "[n]othing in the record suggests that [these objectives were] artificially narrowed in order to defeat potential alternatives."

prior to its application for a Section 404 permit. The Corps agreed with the GLO's conclusion that "jetties would have built up sand on one side and starved the other side of sand; shunting the excess sand into offshore waters and away from the beach." This court has upheld as adequate a consideration of alternatives that were proposed but rejected at a preliminary stage, even when reviewing the more rigorous EIS. *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000).

The other alternative suggested by Appellants is constructing a gate at the mouth of Rollover Pass. It is not clear that this alternative was ever proposed to the Corps. Indeed, Appellants concede that "[m]aybe no one put this simple proposition to the Corps during permit review." Parties challenging compliance with NEPA must structure their participation to alert the agency to their position in order "to allow the agency to give the issue meaningful consideration," unless a flaw is so obvious that there is no need to point out the shortcoming. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–765 (2004). Regardless, Appellants did not raise the possibility of constructing a gate before the district court, so we need not consider it. *See Hardman v. Colvin*, 820 F.3d 142, 152 (5th Cir. 2016)(stating that when reviewing a grant of summary judgment, we generally do not review matters not presented to the district court). Additionally, we note that the construction of a gate is similar to the modification of an existing weir,[6] which the Corps rejected because it "would not prevent sedimentation from entering the pass," and it "would not result in [the] desired lowering of salinity or improvement of water quality."

"Although the relevant regulation does mandate the discussion of alternatives, the regulation does not require that *all* proposed alternatives, no matter their merit, be discussed in the EA." *La. Crawfish Producers*, 463 F.3d

---

[6] A low dam built to regulate the level and flow of water.

at 356 (citing 40 C.F.R. § 1508.9(b)).  The Corps considered and rejected a number of alternatives to closing Rollover Pass.  Thus, we conclude that its decision to issue a permit for closing the pass was not arbitrary or capricious. *See La. Crawfish Producers*, 463 F.3d at 355.

## IV. CONCLUSION

The district court's grant of summary judgment in favor of the Corps is AFFIRMED.